1
2
3
4
5
6                **IN THE UNITED STATES DISTRICT COURT**

7                    **FOR THE DISTRICT OF ARIZONA**

8

9   United States of America,                )          CR-09-2632-TUC-DCB-DTF
                                              )
10              Plaintiff,                    )
                                              )
11  vs.                                       )          **REPORT AND RECOMMENDATION**
                                              )
12                                            )
    Angel Dexter Ramon,                       )
13                                            )
                Defendant.                    )
14                                            )
    _____ )
15

16          Pending before the Court is Defendant's Motion to Suppress Evidence. (Doc. No.

17  17.) The government responded in opposition. (Doc. No. 18.) This matter came before the

18  Court for a hearing and a report and recommendation as a result of a referral, pursuant to

19  LRCrim 5.1. Defendant's motion was set for evidentiary hearing and evidence was heard

20  on April 23, 2010. (Doc. No. 21.) Defendant was present and represented by counsel. This

21  matter was submitted following oral argument at the conclusion of the hearing and taken

22  under advisement.

23          Defendant's motion seeks to suppress evidence seized by the government as the fruit

24  of what Defendant claims was an unlawful detention and arrest. Having now considered the

25  matter, the Magistrate Judge recommends that the District Court, after its independent

26  review, DENY Defendant's Motion to Suppress Evidence.

27

28

# I.

## FACTUAL FINDINGS

On October 28, 2009, Border Patrol Agent Tyler Livingston was patrolling in a remote area south of Arivaca, Arizona, near Sasabe, Arizona. (RT at 5, 15.)[1] While southbound on State Route 286, about 20 miles north of the international border, Agent Livingston saw an older model Chevy SUV, with minor body damage and very dark tinted windows, traveling northbound at a very slow speed. (RT at 6, 8.) The vehicle piqued Agent Livingston's interest because it was shift change and the vehicle was traveling on a road used to circumvent a border patrol checkpoint on Arivaca Road. (RT at 7, 21.) A short time earlier, Agent Livingston had passed six to eight marked border patrol units traveling northbound back to Tucson after their shift had ended. (RT at 9-10.)

Agent Livingston slowed his speed as the vehicle passed his position and he noticed it was newly registered. (RT at 8.) He also noticed that the two occupants were young and did not appear to be from the local community. (RT at 14-15.) The vehicle was traveling in a very remote part of the desert, near a national wildlife refuge, where most of the buildings are abandoned. (RT at 15.) The only store in the area is typically used by people traveling to or from Mexico to refuel their vehicle. (*Id*.) He decided to follow the SUV. (RT at 16.)

Agent Livingston had slowed his marked unit as the SUV approached his position, so when it passed he immediately turned around to follow the SUV. (RT at 8, 16.) He noticed that the SUV had accelerated, requiring him to accelerate to over 100 miles per hour to catch up to it. (RT at 16-17.) Four miles later, when he caught up to the SUV, it was traveling at the posted speed limit, 55 miles per hour. (RT at 18, 41-42.) Agent Livingston then ran a vehicle registration check, stolen vehicle check, and a 72-hour lane check to see whether the

---

[1] "RT" refers to the Reporter's Transcript of the April 23, 2010 evidentiary hearing.

vehicle had passed through the port of entry in Sasabe. (RT at 18.) The vehicle came back registered to an address in Tucson and it had not come through the port of entry. (RT at 18-19.) This was significant information to Agent Livingston because there is a lot of traffic on this part of the road from people traveling to and from Mexico through the Sasabe port of entry. (RT at 19.) There did not seem to be a reason for this vehicle to travel to this area, turn around, and head back to Tucson. (RT at 19-20.) Based upon all of this information Agent Livingston decided to stop the SUV for further investigation. (RT at 23.)

As Agent Livingston walked up to the SUV he could smell marijuana coming from the vehicle and he could see burlap marijuana backpacks used to carry drugs through the desert in the back seat. (RT at 25-26, 43.) Defendant Angel Dexter Ramon was driving the SUV. (RT at 24.)

## II.

## DISCUSSION

Defendant seeks to suppress all evidence seized by government agents as a result of his unlawful stop, detention and arrest. The government responds that the stop and detention were supported by reasonable suspicion and that there was probable cause to arrest Defendant.

The Fourth Amendment's prohibition of unreasonable searches and seizures extends to the brief investigatory stop of a vehicle. *See United States v. Brignoni-Ponce*, 422 U.S. 873, 878 (1975). Therefore, an officer must have a "reasonable suspicion" that criminal activity may be afoot to stop a motorist. *United States v. Diaz-Juarez*, 299 F.3d 1138, 1141 (9th Cir. 2002). When the Court makes reasonable-suspicion determinations, it must look at the "totality of the circumstances" of each case to see whether the detaining officer has a "particularized and objective basis" for his or her suspicions about criminal activity. *United States v. Arvizu*, 534 U.S. 266, 273 (2002).

> The idea that an assessment of the whole picture must yield a particularized suspicion contains two elements, each of which must be present before a stop is permissible. First, the assessment must be based upon all the

circumstances. The analysis proceeds with various objective observations, information from police reports, if such are available, and consideration of the modes or patterns of operation of certain kinds of lawbreakers. From these data, a trained officer draws inferences and makes deductions-inferences and deductions that might well elude an untrained person.

. . . .

The second element contained in the idea that an assessment of the whole picture must yield a particularized suspicion is the concept that the process just described must raise a suspicion that the particular individual being stopped is engaged in wrongdoing

*United States v. Cortez*, 449 U.S. 411, 418 (1981).

Hence, an investigatory stop must be based on facts, not the "mere subjective impressions of a particular officer," *United States v. Hernandez-Alvarado*, 891 F.2d 1414, 1416 (9th Cir. 1989), and the inferences drawn by the officer must be objective and reasonable, *Cortez*, 449 U.S. at 418. Under these circumstances, an officer may draw inferences from, and deductions about, the cumulative information based on experience and specialized training, which "might well elude an untrained person." *Id.*; *see also Ornelas v. United States*, 517 U.S. 690, 699 (1996) (reviewing court must give "due weight" to factual inferences drawn by resident judges and local law enforcement officers).

In the context of stops made near a border, the Supreme Court has identified a non-exclusive set of factors that may be considered in determining whether reasonable suspicion exists: (1) characteristics of the area in which the car is traveling; (2) proximity to the border; (3) usual traffic patterns on the road; (4) prior experience with alien traffic; (5) recent illegal border crossings in the area; (6) erratic or evasive driving behavior; (7) vehicle characteristics; and (8) the behavior or appearance of the driver. *Brignoni-Ponce*, 422 U.S. at 884-85.

Agent Livingston's observations were grounded in objectively identifiable facts. Agent Livingston saw Ramon driving northbound on a remote road at a very slow speed, at a time when Border Patrol agents would be leaving their patrol areas to change shifts. (RT at 6-8.) Agent Livingston had previously passed numerous marked Border Patrol vehicles

- 4 -

heading back to the Tucson station and Ramon's slower speed appeared to him intended to create distance between those vehicles and Ramon (RT at 9-10, 14). *See Arvizu*, 534 U.S. at 277 (officer's consideration of defendant's presence during shift change reasonable).

Ramon was driving an older model SUV, with new plates and some body damage. (RT at 8.) The new plates suggested the vehicle was recently purchased. (*Id*.) This was significant to Agent Livingston because he knew that the majority of load vehicles seized by agents in the Tucson Border Patrol Sector were damaged older model vehicles with new registration. (*Id*.) Such vehicles are inexpensive because they are not sold at normal car lots due to their poor condition, rather, they are typically sold by towing companies. (RT at 8, 35.) In addition, the side and rear windows on the SUV were tinted very dark. (RT at 8, 37.) Agent Livingston believed this was significant because smugglers often tint their windows to conceal their contraband (RT at 37). *Brignoni-Ponce*, 422 U.S. at 884 (aspects of the vehicle itself may justify suspicion).

The vehicle was only 20 miles north of the international border when it was first encountered by Agent Livingston (RT at 6, 15). *Brignoni-Ponce*, 422 U.S. at 884 (officers may consider proximity to the border). When Agent Livingston turned around to follow Ramon, Agent Livingston had to accelerate to more than 100 miles per hour to overtake him. (RT at 16-17.) Agent Livingston noticed that Ramon had accelerated to the posted speed limit. (RT at 18, 42.)

Based on a records check, Agent Livingston simultaneously learned that the vehicle was registered to an address in Tucson and had not crossed the international border. (RT at 18-19.) Agent Livingston had already noticed that both Ramon and his female passenger were young and not from the local community. (RT at 14-15.) This was significant to Agent Livingston because they were in a remote area with nothing for young people to do. (RT at 16.) They did not appear to be hunters and the only other attraction is a very expensive dude ranch costing patrons several hundred dollars per day (RT at 39). *Arvizu*, 534 U.S. at 277 (family unlikely on a picnic outing).

Border patrol agents, not courts, are trained to detect smugglers, and "[t]he facts are to be interpreted in light of a trained officer's experience." *United States v. Michael R.*, 90 F.3d 340, 346 (9th Cir. 1996). The facts presented here support the conclusion that Agent Livingston acted with reasonable suspicion.

After Defendant was stopped, Agent Livingston smelled marijuana coming from Defendant's SUV and saw burlap marijuana backpacks used to carry drugs through the desert in the back seat. (RT at 25-26, 43.) Accordingly, there was probable cause to arrest Defendant. *United States v. Delgado*, 4 F.3d 780, 788 (9th Cir. 1993) (probable cause to arrest where officers saw cocaine in trunk).

### III.

### <u>RECOMMENDATION</u>

In view of the foregoing, it is recommended that, after its independent review of the record, the District Court DENY Defendant's Motion to Suppress Evidence. (Doc. No. 17.)

Pursuant to Federal Rule of Criminal Procedure 59(b)(2), any party may serve and file written objections within 14 days of being served with a copy of this Report and Recommendation. If objections are not timely filed, they may be deemed waived. The parties are advised that any objections filed are to be identified with the following case number: **CR-09-2632-TUC-DCB**.

DATED this 13th day of May, 2010.


_____
D. Thomas Ferraro
United States Magistrate Judge